**Doug CHERRY, Plaintiff,**

v.

**HUNGARIAN FOREIGN TRADE BANK, LTD., Defendant.**

**No. 89 Civ. 6446 (MBM).**

United States District Court,
S.D. New York.

May 16, 1991.

James D. Fornari, Solomon & Fornari, P.C., New York City, for plaintiff.

K. Ann McDonald, Davis Polk & Wardwell, New York City, for defendant.

---

## OPINION AND ORDER

MUKASEY, District Judge.

This is a motion by defendant to compel testimony and document production in this suit by a lawyer against his former client to collect a fee, and for sanctions pursuant to Fed.R.Civ.P. 37(a)(4). Plaintiff asserts that the testimony in question is subject to the attorney-client privilege, notwithstanding that it would come from a lawyer whom plaintiff had hired to serve as co-counsel to defendant and who was supposed to be serving in that capacity at the time of the conversations to be inquired into. The conversations allegedly involved plaintiff's plans to sue the client that he and the lawyer witness were supposed to be representing, Hungarian Foreign Trade Bank ("HFTB"), which is an entity partially owned by the Hungarian government and is the defendant in this case. The documents at issue include a letter to plaintiff's current counsel, a copy of which, however, was sent to the prospective lawyer witness, as well as various documents drafted by the lawyer witness in connection with the prospective suit against HFTB, as to which plaintiff has asserted both attorney-client and work product privileges.

HFTB argues both that an attorney-client privilege never existed between plaintiff Douglas Cherry and the prospective witness, David Beale, and that if one did it was waived by testimony Beale and Cherry have already given without objection, and by documents already produced. It argues also that to shield the documents in question from disclosure pursuant to the work product privilege would subvert rather than serve the adversary system, and accordingly that that limited privilege is inapplicable as well.

As set forth below, the motion for discovery is granted in all respects. The motion for sanctions under Fed.R.Civ.P. 37(a)(4) will abide the outcome of this case.

### I.

The facts underlying this dispute, to the extent relevant to this motion, are as follows: Cherry, a Texas lawyer experienced predominantly in negligence cases, was retained in 1988 by HFTB, a company then becoming acculturated to the ways of Western commerce but not yet savvy to the ways of U.S. litigation, to represent it in a California action against an oil refining company. The employment agreement contained the following paragraph:

> "Should attorney [Cherry] deem it necessary to associate other legal counsel and other experts to assist in the matter, he may do so with notification to Client. It is further understood that from time-to-time Attorney may deem it necessary to utilize the services of partners, associates, and other emplyees of the firm who shall be under the supervision and moral, ethical, legal and material responsibility of Attorney."

Thus the agreement contemplated that Cherry could enlist two categories of lawyers to assist him: "other legal counsel," who would be hired only upon notice to HFTB, and his own "partners, associates, and other employees of the firm," who were to labor under his moral and ethical suasion—a provision that takes on an ironic aspect in view of the underlying dispute in this case. In any event, the distinction between the two categories is that "other legal counsel" were lawyers who were separately retained and were paid directly by HFTB. Beale is one such lawyer, who has already collected more than $450,000 from HFTB for his work.

In August 1989, Cherry asked Beale to advise and assist him in preparing to sue HFTB for a $12 million fee once the then imminent settlement of the California action was in place. Beale and his associate George Lang set about doing so. Neither Cherry nor Beale at the time informed HFTB of what they were up to, or resigned from representing HFTB. It is these conversations, and the documents generated as a result, as to which Cherry claims privilege.

In addition, in early August 1989, Cherry wrote a letter to John Ensle, of counsel to Cherry's firm, in connection with a demand letter to HFTB which Cherry had asked

Beale to draft. The letter to Ensle is also claimed to be privileged.

On August 28, 1989, after the settlement had been effected and Cherry had made demand on HFTB for a $12 million fee, he had a conversation with Beale's associate, Lang, discussed in a memorandum Lang drafted which has already been disclosed to HFTB, about suing HFTB and attaching certain bonds that were among HFTB's meager benefits from the settlement Cherry achieved in the California lawsuit. Cherry has objected on grounds of attorney-client privilege to any testimony about the conversation and related events that are the subject of the Lang memorandum.

The next day, August 29, Cherry spoke to Beale about hiring a lawyer to sue HFTB, the client they were both representing, and Beale did certain work on the prospective suit. Privilege has been asserted as to both that conversation and Beale's bill to Cherry for services performed as a result of it. The same day, Lang sent Cherry certain documents. That letter and the documents are claimed to be privileged.

On September 21, 1989, Cherry sent a letter to his attorney in this case, and sent a copy as well to Beale, who he has conceded was not representing him at the time. This letter, too, is said to be privileged. It appears that Cherry later sent another version of this letter to HFTB under the following circumstances: Cherry was in Budapest in early October, apparently trying to sweet-talk HFTB into paying his fee, but did not then disclose that suit had already been filed. The day after he left, HFTB's New York agent received the complaint. The Hungarians felt ill used, and Cherry, apparently still hoping to be paid voluntarily, tried to smooth things over by suggesting to HFTB that he had not known about the filing of the suit when he was in Budapest and that such filing had occurred in violation of his instructions. In aid of that, he sent HFTB what purported to be a copy of the letter to his attorney now in dispute, including a paragraph instructing that attorney to take no action without consulting him. HFTB sug-gests that the copy sent to HFTB was a sham, and that the original letter did not include the paragraph above referred to. HFTB wants the original.

## II.

Dean Wigmore has formulated the elements of the attorney-client privilege as follows:

"(1) Where legal advice of any kind is sought, (2) from a professional legal adviser in his capacity as such, (3) the communications relating to the purpose, (4) made in confidence, (5) by the client, (6) are at his instance permanently protected, (7) from disclosure by himself or by the legal adviser, (8) except the privilege be waived."

8 Wigmore, Evidence § 2292 at 554 (McNaughton rev. 1961). That formulation is accepted in this jurisdiction. *Sobol v. E.P. Dutton, Inc.*, 112 F.R.D. 99, 102 (S.D. N.Y.1986) (Weinfeld, J.). Moreover, the burden of establishing these elements rests on the party invoking the privilege. *United States v. Stern*, 511 F.2d 1364, 1367 (2d Cir.1975).

HFTB focuses its argument on the two weakest links in that chain of elements: the fourth ("made in confidence") and the eighth ("except that the privilege be waived"). As Wigmore points out, when a lawyer represents two clients, as Beale apparently was doing here, the fourth element, "made in confidence," may become problematic. Wigmore discusses several hypothetical situations to explore whether the privilege survives in cases of dual representation. Cherry relies on *Eureka Investment Corp., N.V. v. Chicago Title Ins. Co.*, 743 F.2d 932, 936–38 (D.C.Cir.1984) (*per curiam*), which in turn relies on one of Wigmore's hypotheticals, as follows:

"A communication by A to X as A's attorney, X being then also the attorney of B, now become the party-opponent, is ordinarily privileged because of the relation of X toward A. Nor does the fact of A's knowledge that X is already B's attorney, nor the fact of B's being already adversely interested destroy the privilege. This is so because, although X ought not to undertake to act for both in

any matter where there is a possibility of adverse interests, nonetheless A is protected by reason of the relation."

8 Wigmore, Evidence § 2312 at 608 (McNaughton Rev.1961). Cherry casts himself as "A," Beale as "X" and HFTB as "B." HFTB argues that the hypothetical is inapposite because unlike "A," Cherry owed a fiduciary duty to HFTB as its lawyer, and that *Eureka* and the quoted hypothetical were distinguished on precisely that ground in *Western Gas Processors, Ltd. v. Enron Gas Processing Co.,* Civ. A. No. 87–A–1472, 1989 WL 20529 at 7 (D.Colo. March 6, 1989). I agree.

Here, Cherry appears not to have read far enough in Dean Wigmore's treatise. Had he read just one page further, he would have encountered the following:

> "In the foregoing case [the hypothetical quoted above], if A consults X as his attorney, with the express purpose of inducing him, while B's attorney, to act adversely to B, the communication would clearly cease to be privileged because, by a former part of the principle (§ 2298 *supra*), the privilege cannot cover communications designed to achieve a fraud."

8 Wigmore, Evidence § 2312 at 609 (McNaughton rev.1961). That is this case. Beale was already HFTB's lawyer when Cherry approached him with the express purpose of inducing him to act adversely to HFTB. That Cherry himself also owed HFTB a fiduciary duty simply adds weight to HFTB's position.

In the circumstances of this case, there was and is no privilege. Accordingly, I decline to deal with whether a non-existent privilege has been waived.

### III.

■ Although a lawyer's mental impressions, opinions and legal theories embodied in documents generally are protected from disclosure, Fed.R.Civ.P. 26(b)(3); *Horn & Hardart Co. v. Pillsbury Co.,* 888 F.2d 8, 12 (2d Cir.1989), those protections are not available when fraud seems to be afoot, *cf., In re Sealed Case,* 676 F.2d 793, 812–15 (D.C.Cir.1982) (grand jury subpoena), as it does here. Both Cherry and Beale appear to have been engaged in betraying their fiduciary obligations to HFTB at the time the documents in question were created. Indeed, that betrayal seems to have been the occasion for creating those documents. Accordingly, Cherry has failed to carry his burden of proof and his claim of work product privilege fails for the same reasons as did his claim of attorney-client privilege.

### IV.

Defendant has moved for sanctions pursuant to Fed.R.Civ.P. 37(a)(4), which mandates an award of expenses when a motion to compel is granted "unless opposition to the motion was substantially justified or ... other circumstances make an award of expenses unjust." Here, the issue of substantial justification, and perhaps the issue of "other circumstances," are intimately tied to the merits of the underlying lawsuit. Accordingly, decision on the sanctions application will abide the outcome of the lawsuit.

SO ORDERED.